I mean, it's not cool to do it, because you can panel issues and campaign across the city. But it's a precircle to get to the whole point. I'll kind of do the commission in the lab for you. Yeah, but with the lab, because you know what, I hear you and I wasn't thinking of doing it. I mean, I want to make sure that, you know, we're there and we decide to do it. You know, we want to get out and we throw it out. And then we've got 16 people stuck here on this thing. Let's see that happen. All right. Mr. Buchter, you're up first. Thank you, Your Honor. My name is Clark Buchter, Jr. I'm representing the City of Shreveport and retired Chief of Police Willie Shaw. And a matter that has been filed by Ms. Hassan. This is an appeal by Chief Shaw of the denial of qualified immunity by the District Court for the Western District of Louisiana. The basis of the ruling was that due to Shreveport Police Officer Corporal Gibson claiming his Fifth Amendment privilege, the District Court applied an adverse presumption concerning Chief Shaw's knowledge of a possible rumor concerning Detective Green's reputation at the Shreveport Police Department. The alleged rumor was that Detective Green had a reputation at the Shreveport Police Department that he was fresh with women. Accepting this as true, the District Court found that Chief Shaw failed to provide additional training and discipline to Detective Green to prevent him from allegedly raping Ms. Hassan while on duty in his office. It is Chief Shaw's position that the District Court erred in not granting him qualified immunity in this particular case. The Court is aware of the statutes and standards applicable to qualified immunity and that plaintiff bears Tell us just succinctly, what is in the summary judgment record? What does the summary judgment record consist of? We know we've got the complaint. Were there any depositions taken of anyone? Yes, Your Honor, there was a deposition taken of Detective Green. There was a deposition taken of Ms. Hassan. There was a deposition taken of, well, there were several depositions, two I believe, of Corporal Gibson. That's the, I believe that's the extent of the depositions taken in this matter. So there was no deposition taken of Chief Shaw? That is correct. There was no depositions taken of any training officers, nobody at the Shreveport Police Academy, none of that. All right, so does the summary judgment record have documents or whatever relative to training of either officers or detectives? I mean, there's a manual. Is there anything in the summary judgment concerning, you know, training or any of that? I do not believe anything attached to the summary judgment motions concern the training aspect other than the affidavit of Chief Shaw concerning the training of Shreveport police officers. All right, so what about policies? Is there anything in the record document-wise or, you know, about policies? In other words, trying to get our head around, you know, what's in the summary judgment record, and we'll get more into that, but I'm just trying to lay the baseline out. So as far as paper goes, we don't have manuals or documents or any of that. Is that correct? That's correct, Your Honor. All right, okay, press ahead. I just want to get clear in my mind. We haven't, I mean, we've read the briefs from the parties, et cetera, but we haven't done a deep dive yet into all the records, so keep going. All right, thank you, Your Honor. Again, the plaintiff bears the burden of proof as to whether the alleged wrongful conduct, which in this case was the failure to provide additional training or discipline, violated established law. Since Chief Shaw was in a supervisory capacity for Detective Green to establish supervisory liability, it must be shown that Chief Shaw acted with deliberate indifference to the alleged violation. The adverse presumption applied by the district court was that Chief Shaw was aware of Detective Green's reputation for what the district court calls inappropriate sexual behavior. But the question which Corporal Gibson was asked, and he refused to answer, was there a reputation of Detective Green that he was being fresh with women, not having inappropriate sexual behavior? Does this mischaracterization by the district court have any significance concerning the alleged error as alleged by the district court? I don't know the answer to that question. Now, what do you mean? I didn't follow. Well, the . . . Please state that. What's the alleged error? I mean, you're alleging error that she relied on this adverse inference as being sufficient to deny summary judgment. Is that the error that you mean? That is the error, yes, Your Honor. All right. And the district court characterized the failure to answer as inappropriate sexual behavior, which Chief Shaw would submit, is somewhat stronger than being fresh with women, and just pointing that out to the court. Was there any introduction? It seems to me the briefs are saying it's unclear why Gibson would assert the Fifth Amendment in this circumstance. Was there any introduction of testimony from the criminal trial to show how Gibson may have been asked questions along these lines at the criminal trial? There was, to my recollection, there was no introduction in this motion for summary judgment. But in his deposition that Corporal Gibson had initially, he was asked about his testimony at the criminal trial, and he addressed those issues. So did he testify? I mean, did he state that he testified as to questions like this, of the reputation of this particular Officer Green and otherwise? He was not. I do not believe he was specifically asked about Detective Green's reputation at the time he was answering questions in his initial deposition. He was asked about his testimony, and he explained one of the issues was the sexual relations he had with Ms. Hassan, allegedly the night before or the morning of this alleged rape. That Gibson had. Excuse me? The relations that Gibson had with Hassan. That's correct, Your Honor. His only testimony in his original deposition talking about Corporal Gibson was that he knew Detective Green. He maybe had one case, if that's the way to state that, with Detective Green in his 10 years with the force. He really had no interaction with Detective Green in the past and did not have any concerning this particular incident up to the time, I believe he said, of the criminal trial or after. What's your argument about using an adverse inference like this to deny summary judgment? Well, the argument is that qualified immunity is more of a legal approach than a factual approach. The district court had denied the summary judgment based upon the adverse inference, but qualified immunity, we would submit to the court, is a step above a general motion for summary judgment. It falls under the same category, obviously, but it has a little higher standard. And this court, in previous decisions, even where there are specific acts, not rumor or presumptions, but specific facts of a prior incident, has said that qualified immunity would apply in those particular situations, and we've cited those in the brief to the court. So the argument is that qualified immunity standard is a step above the general motion for summary judgment standard, if that's the appropriate way to put it. Counsel, I realize it's a colloquial term that's probably been around for a very long time, but was anyone in this case, particularly Mr. Gibson, asked to define what he meant by saying fresh with women? I mean, that's not a legal term. It's not a term that has elements that we can test as to whether or not they're present. Presumably, it's a term that he's familiar with and could range anywhere from unwanted flirtatious behavior or aggressive social behavior all the way up through criminal types of things that happened in this case. So do we know in this case what he's talking about? I think it's kind of important, if we're going to assert an adverse inference, that someone else is aware of it. We need to find out what it is exactly he's talking about. That's absolutely correct, Your Honor. At the time he was asked that specific question, he was taking the fifth, and he did not answer that, did not provide any definition to that. My recollection is, is in his conversation with Ms. Hassan, when he brought that up, he said he had a reputation. Detective Green had a reputation for being fresh with women, but that was not, to my recollection, explained or defined. All right. And also, I was going to ask you, his testimony, he testified in the related, the underlying criminal case. Is that correct? I'm sorry, Your Honor. He did testify in the underlying criminal prosecution. Is that correct? In his initial deposition, I believe he did answer those questions, yes. That's right. And was that part of the summary judgment record in this case offered as Rule 56 support or contravention? I do not believe so, no, sir. All right. And I was going to say what, there's an issue, as the Court just brought up, of what fresh with women means. It could run the whole gamut of a flirtatious comment as opposed to an actual sexual conduct of some kind. And no one knows exactly what was meant by that particular characterization by Corporal Gibson. We cite the case of Hardeman to the Court, Hardeman v. Kirk County. While this is not a reported case, the facts of that case were very similar to this case. An inmate alleged that a jailer had oral sex with her and then raped her. The jailer previously had an incident where he made inappropriate advances to a female student in a school district. There was no disclosure of that in his initial background. But this Court, in ruling in that case that qualified immunity was applicable, said that even if they had discovered that, the additional training for this particular jailer would not be required. And the important quote in that case is that it would have, and this is a quote, it would have required an enormous leap to connect improper advances to a female student to the rape that happened some years later. That was the quote in the case. And that's exactly what we have in this particular case. We would submit to the Court that it would be an enormous leap to connect being fresh with women to the rape that occurred, the alleged rape that occurred with Ms. Hassan in Detective Green's office. Even where there was actual evidence of a prior incident, in this case the improper advances to a female student, not a rumor or presumption, as we have in this case, qualified immunity was granted. The District Court also found that based on the adverse presumption, Chief Shaw acted with deliberate indifference by not training Detective Green further, having further training. We again cite the case of Rivera to the Court, which again is very similar to this case. There, a jailer raped an inmate. Just six months before, there had been a prior sexual abuse incident involving a jailer, and the no policies procedures were changed. No additional training was done for jailers concerning sexual involvement with the inmates. The same analysis would apply here in this particular case to Chief Shaw, that the alleged rumor of Detective Green being fresh with women, no further training was needed or should not be needed based upon the analysis of that case to prevent Green from raping someone in the future, allegedly raping someone in the future. Plaintiff cites the Wenger case in support of their theory of the case. That case dealt with excessive force, where there were search warrants, a group of officers serving search warrants late in the evening or early morning hours, and excessive force was used. We have cited some excessive force cases, one particularly of Roberts v. C. of Shreveport, that we think are more applicable concerning excessive force applicability to this particular part of the case. Time is about out. Any other questions that the Court has? Probably when you come back up on rebuttal, some will be spurred by the other side, so you've reserved your rebuttal time. So we'll hear from Mr. Ritchie. Thank you, Your Honor. Good morning, Your Honors. My name is Elton Ritchie. I represent Malia Hassan in this matter. As you know, it arises on summary judgment and the denial of Chief Willie Shaw's motion for summary judgment with regards to immunity, under qualified immunity, excuse me, and solely on that issue. The Chief complains that Judge Foote erroneously denied that motion, relying exclusively on one single adverse inference to the question which was posed to Officer Stephen Gibson about whether or not he had previously stated to Mrs. Hahn that Officer Green had a reputation within the Shreveport Department for being fresh with women. That's not correct. To be clear, before we get into what Gibson said or did not say, is that the only summary judgment evidence you've offered the district court to defeat the motion? No, Your Honor. Is it only the Gibson testimony and the adverse inference? In fact, on the first page of her opinion, Judge Foote refers to the trial testimony of Officer Stephen Gibson as being, who at the time of the alleged rape was romantically involved with Hassan, as being an important witness at the trial. So where I would start is this. Did she preside over the criminal trial? I'm sorry? Did Judge Foote preside over the criminal trial? No, sir, she did not. The trial took place in Cattle Parish District Court. That's what I thought. So back up a minute. I'm trying to understand. So was the, we're trying to understand the context of this summary judgment. Absolutely. And what's in. And this is just kind of all over bits and pieces, really. So. Let me give you that, Judge. Explain what you're saying, because then you'll have to ask the question, what more than this adverse inference on Gibson are you relying on? Okay, you said she, meaning Judge Foote, I take it, is referring to testimony at trial. So how does Judge Foote know what the testimony was? It was in the record. The transcript's in the record. And you filed it in opposition to this motion? You filed Gibson's testimony from the state court criminal prosecution. Yes, sir. She cites her statement about him being an important witness at document 54-4. And I reviewed the record on appeal this morning. I saw excerpts of his testimony in there. I know that's there. But my question is, you filed it on behalf of your client as Rule 56 material in response to this motion for summary judgment. Your Honor, I believe we did. I don't have that motion in front of me at the moment. Mr. Ritchie, you're here on summary judgment. You and Mr. Book are the only two people here. Yes, sir. So we should not be asking each of you guessing about what happened. I mean, it's here on oral argument. We've had you come down here. And both of you all should know what's in this deal. Now, you, did you or did you not, somebody had to put it in there. Judge Foote didn't preside on it. So if it's in there, what was the basis of it being in there? Did you file it? And on what basis did you file it? It was filed into the record in support of our motions, Your Honor. I know that there were, we have also filed a, there was a cross motion for summary judgment as well on this, on behalf of Ms. Hassan, which was denied. So I can't, standing here at the moment, tell you which one of those it was there before the court on. But clearly before the court in relation to this motion, she relied on that. Mr. Rich, let me ask you for clarification. Both Judge Inglehart and I asked your opposing counsel this same question. Was a transcript of the testimony from the criminal trial placed into the summary judgment record? Now, it may not have been phrased exactly that way, and perhaps he didn't understand. But he said no. You're saying yes. I guess we'll have to look at the record and find out. But you are saying your recollection, standing there, is that we'll find a transcript of what this corporal, I think it is, Gibson said in the criminal trial in the summary judgment record. I believe so, Your Honor. All right. I believe that based on my recollection. What is in there that matters? It gets to whether Willie Shaw would have known that Green would not just be fresh but would do something comparable, I mean, whatever you think the legal standard is. Thank you for that. Let me take you right back to your question, Judge Stewart, the context. It arises in this context. First, there was more than one invocation of the assertion of the Fifth Amendment to various questions during that deposition, including questions about whether or not Officer Gibson had given false testimony at the trial of Officer Green, whether he had given misleading testimony at the trial of Officer Green, whether he had previously stated that there would be efforts by the Shreveport Police Department to concoct something to sweep this under the rug, as it were. Those questions are outlined and presented. Counsel, let's go through what the district judge cited that you offered. As I understood your answer to Judge Southwick, the district judge had before her deposition testimony that Mr. Gibson gave in which he invoked his Fifth Amendment, out of which the adverse inference arose. Then she also had, you're asserting, she also had a transcript or a portion of a transcript of what Mr. Gibson said in the State court prosecution. Yes. Okay. Before I go through these statements here, does she have anything else from you to defeat the summary judgment under Rule 56? She had Ms. Hassan's testimony. Okay. And her testimony regarding the incident, her conversations with Gibson as well. Okay. Now, but the district judge doesn't cite to that because what we're talking about here for purposes of this motion is Shaw, and Shaw is there's a deliberate indifference argument that you've made and a failure to properly train. Is that correct? That's correct, Your Honor. Okay. Now, let's go back to Gibson's testimony that the district judge cited to, and let's talk about the adverse inference. As I understood it, the first question that was asked was, unrelated to the audio that I just played, do you believe that the Shreveport Police Department is crooked? He asserts his Fifth Amendment privilege. Isn't the adverse inference that Mr. Gibson believes that the Shreveport Police Department is crooked? That would be the adverse inference to be drawn from that. From that. Okay. Well, let's move on. All right. All right. Well, let's move on. We're going to take all of them. Let's move on. Next question. Would there ever have been a reason for you to say that the Shreveport Police Department was going to try to cover this up because they were crooked? So the adverse inference is that the Shreveport Police Department was, in fact, going to try to cover this up because Mr. Gibson believes it's crooked. From that one alone, standing alone, that's correct. Okay. Okay. Keep in mind that we're talking about Shaw here. So let's move on to the next question. Do you remember how, do you remember telling Malia Hassan that ain't none of this your fault, that's his ass, that's the department's ass? So the adverse inference in this case would either be, I assume it's not that it was her fault, the adverse inference is that the department is in trouble and Mr. Green is in big trouble. Isn't that correct? That's correct, Your Honor. All right. Now the next question, is there any reason you would have told Malia Hassan that the police department was trying to concoct some S.H.? The adverse inference is that he did tell her that the Shreveport Police Department was trying to concoct. Is that correct? Correct. Can we read that in as you have? Now, next, do you remember telling Malia Hassan that they do so much dirty stuff around there and then you got to scrape the bottom of the barrel to try to find officers and get anybody in here? Well, the adverse inference on that is that, in fact, they do, I assume when he means stuff, he means obviously dirty or improper stuff, and that the officers are bottom of the barrel, as the question was phrased. And the negative inference there would flow to hiring, I suppose, and to reduction. Okay. Fair enough. Do you remember telling Malia Hassan, I'm tired of the whole expletive redacted administration where they do stupid stuff around here and half of them themselves are criminals? The adverse inference is that he believes that half of the people at the Shreveport Police Department are criminals. That would be an inference, yes. Okay. I'm still looking for, you know where I'm going with this, I'm still looking for Shaw. All right. Let's keep going because we only have a couple more, three, four more. Do you remember telling Malia Hassan that James Green had a reputation for getting fresh with women? The adverse inference is that he did remember telling her that, or let's go even further, that James Green, in fact, did have a reputation of, quote, getting fresh with women, correct? Correct. All right. Have you said to anybody that Mr. Green had a reputation for getting fresh with women at the police department? The adverse inference is that, in fact, he had, he did say to someone, it says anybody, he did say to someone that Mr. Green had a reputation for getting fresh with women at the police department. All right. And I'm going to assume that at the police department means both fellow employees at the police department and other people while he was at the police department, which is the facts of this case. And the last question that, not the last one, but when you're asserting your Fifth Amendment privilege, is it because you're afraid you're being criminally, charged criminally, or because you're afraid you will lose your job? He asserts the Fifth Amendment. Adverse inference, let's say, is both. Have you ever lied? Actually, Your Honor, what he says is, his lawyer says, he's asserting the privilege for protecting from any type of criminal charge. Okay. That's spoken through his lawyer. Right. It's not because of. Right. But I'm talking about the adverse inference one can draw from that question is that he's doing it for both reasons. Is that correct? Correct. All right. Then, have you ever lied under oath? Well, the adverse inference is that he has lied under oath. Yes. Without specifying when. Have you ever given false testimony? Adverse inference is that he has given false testimony. Have you ever given misleading testimony? That he has, in fact, given misleading testimony. And did you lie under oath during your testimony at James Green's trial? The adverse inference is that he did lie under oath at James Green's trial. So I'm trying to get from — and that's what the district judge relied on. I'm trying — and I need you to help me find out why — I'm trying to get there, Your Honor. And I want to know how does this implicate Shaw's knowledge and deliberate indifference or failure to train such that there should be — qualified immunity should not be granted? Well, go back to the context, as Judge Stewart's pointing out, that this arose in. Ms. Shaw reported this to Green, who did not report it to anyone. He was interviewed during the course of the investigation. Say again. Shaw — Excuse me. I said misspoke. Gibson. Gibson. She informed him. He did not tell anyone. Informed Shaw. You're saying that from these questions and adverse inferences — I'm saying — I'm saying — let me get finished, Your Honor, to the entire context. Look at the entire context. Officer Gibson does — says nothing to nobody. He does not report this. Ms. Hassan reports it. Then during the course of the interview, he is interviewed, but he does not say anything about — in fact, he is misleading about his own romantic involvement and reputation with Ms. Hassan. Then he appears at the trial. Officer Green does not take the stand at the trial or defend himself, as it is right. Instead, he presents — the defense presents Officer Gibson, who then provides testimony, which is misleading and untruthful. And specifically the reputation, what the judge said is that the reputation piece of that, coupled with everything else, is enough to reach an inference that there is a culture of indifference in the Department. Now, counsel, you made a leap that I didn't quite follow. We were talking about the testimony at the criminal trial, and then you said that that — that's when you want to make your leap. Was there anything at the criminal trial about his reputation that Chief Shaw would have known about? Not at the criminal trial. Okay. So there's nothing in the criminal trial that exposed this knowledge that Shaw should have had. So it seems to me the adverse inferences you're talking about still don't get you to Shaw. But they do arise in the context of the other universal facts here, which involve the trial testimony and which involves Gibson's actions and inactions and his misleading testimony at that trial, which when asked about — The criminal trial was on what charge? Misuse of office? The criminal trial was on abuse of power. It was premised on the idea that he had somehow abused his position to — to obtain consensual sex with Ms. Hassan, which she denied vehemently, that it was ever consensual under any conditions. So it arises in that context. What Judge Foote says later on, I believe it's at page 7 and 8 of that opinion, is that all these things together are sufficient to conclude — Well, we know what she said, but the problem we're all having here is a lot of stretch. You still haven't addressed the question of how this connects up to the police chief in terms of the qualified immunity and the deliberate indifference. You've given us this context about the trial, but you still haven't answered straight on how you connect it. And you seem to be veering away. You say the trial didn't rely on it, but you seem to be distancing yourself from that you produced this in order to show something. So the earlier question I asked of you, did you put this in? And if you put it in, what is it you intended to show by it? Because that's not — in terms of deliberate indifference and qualified immunity, as to Shaw, tell us, articulate what the probative worth of all that was, given the burdens on qualified immunity and deliberate indifference. That's what we're not hearing. That it demonstrates a culture existed in that department that this chief was indifferent to, that he should have been aware of, that officers were, A, not properly trained. As Judge Foote points out in his own affidavit, Chief Shaw doesn't say that he was specifically trained, he being Green, specifically trained about that. Well, Green doesn't need to be trained not to rape people in his office while he's on duty, does he, or any point in time. One would hope that he would not need that. Well, the Supreme Court has even said, for instance, in the instance of the district attorneys, the Harry Connick cases, the Supreme Court has said that even an assistant must comply with Brady. I would think in this instance, if you're hired as a police officer, you pretty much know that you shouldn't commit a criminal act on the job or off the job. It's sort of like — I mean, we're talking about training here. You don't have to train employees that they can't lick the walls. They're supposed to know stuff like that. Your Honor, you have to understand, this — there was two contacts between Ms. Hassan and Detective Green. So we're talking about — The first one was — the first one, again, sexual contact was — We're talking about the first instance here. In terms of Shaw, we're talking about the first instance, the day she comes in to file the complaint, and he purportedly touches her. That's correct. Okay. So we're not talking about the rape. He's not deliberately indifferent to that because he fired her. But that sexual misconduct exists on a continuum. And when he's not trained and knows that he can't do that, it leads to a — it leads to a slipping down that continuum. And that is the point that I believe that Judge Foote was making when she pointed out sexual misconduct exists on a continuum. There was enough here from the inferences that can be drawn to establish a culture of indifference to sexual misconduct by officers on the Department such that they were — it was not dealt with, not disciplined, not properly trained. That is the conclusion that she reached. Now, those are inferences that have — that can be drawn negatively from the testimony of the depositions, from the testimony of Ms. Hassan, from the testimony of Gibson at the trial, and his admissions, though negatively inferred, that he gave false testimony at that trial. So the context, as you pointed out, Judge Stewart, you can't simply piecemeal one simple question and say, well, that's it. There's nothing else to it. That's why I went through all of them. And I still am looking for the question that links Shaw to deliberate indifference or a policy or procedure that he perpetuated that allowed this to happen. That's why I went through each and every one of the questions that the district judge cited, too. Yes, sir. And that's appropriate. But we have to consider them in context of all the other facts in the case that the judge has. Well, I'm always of the view the appeal is from the judgment, not from the reasons. So we've got to celebrate judgment. I mean, the appeal is from the judgment. Now, withstanding what the trial judge said, you've got to prevail as a matter of law. On here, often we'll affirm judgments not necessarily agreeing with everything a judge said, but if it's affirmable on the record. So the burden is not convincing us what the trial judge said we ought to take as that. We're asking you for the record. And so I want you to articulate from a different standpoint, first of all, what is your articulation of the basis of the denial of qualified immunity as to Chief Shaw? And then I want you to articulate what is the deliberate indifference that you're able to establish. You know that that's a tough standard. So what from this evidence supports that? But first, as to the qualified immunity. To the qualified immunity, the evidence, and I'm down to 10 seconds. I understand. I see the clock, but there's not a time limit on my question. Right. All right. The deliberate indifference of Chief Shaw is to the culture that exists that can be factually inferred to exist. How did you establish culture through one witness? Assuming the adverse, how many police are in the Shreveport Police Department? Several hundred. Okay. So how do you establish a culture from fresh with women to rape? Through the testimony of one witness who's on trial for misuse of office, or whatever the charge was. Excuse me, Your Honor. He was not on trial. The witness whose testimony we're relying on is Gibson, who was testifying in support of his client. I understand that, but I'm still saying, I'm still asking, how do you make the connection in terms of the qualified immunity we've been at from Chief Shaw? In other words, the trial judge relies on this culture, and I'm asking, what case do you have to support, even for summary judgment purposes, establishing this, quote, culture within a department of several hundred officers through the adverse inference drawn from the testimony of one witness? That's what I'm asking. The key witness who is inside the department, who is well-situated to know the culture, and has made statements about that culture to Ms. Hahn, very specific statements that the department knew about Green's reputation, that the department would move to concoct something to cover this up, and in referring to the department, he's clearly referring to the supervisory department, and Chief Shaw would be responsible for knowing what's going on in his own department. What was Gibson's official position in the police department? Where was he within the hierarchy of the Shreveport Police Department? He was, at the time, I believe, a corporal. He was a corporal. Yes, sir. So he wasn't a chief. He wasn't one of however many assistant chiefs there are, and then you've got all that hierarchy of, I guess, the uniformed people, so I guess he would have been a non-uniformed detective, right, or something? I believe he would be. I believe he would be. That's correct. He would not be at the patrolman level or the patrolman first class level. He would be somewhat of a supervisory position. So I'm just asking, what's in the summary judgment that would allow the trial judge or us to make the inference you want to make vis-à-vis where Gibson was within the whole hierarchy that his statements attributable to him would give him knowledge of this culture within the whole department? I'm not sure I understand your question. Well, I'm trying to determine what you put in the summary judgment record to allow the trial court or us to make the inferences that you're asking for about this culture if you're drawing it principally from this one witness's testimony and adverse instance. I'm like, what's the best case you have for us being able to do that as a legal matter? That's what I'm asking. I appreciate that. That would be his own false and misleading testimony at the trial and his testimony, the inference that can be drawn when he uses the word department. He's using it in a global sense, and reputation is something commonly shared among members of that community within that department, which would include the supervisors and the supervisory hierarchy as well as the line officers. Reputation is knowledge that's pervasive in a given community, and he stated that community. So you didn't seek to depose Chief Shaw? No, sir. I don't believe that we did. Chief Shaw testifying in the first JDC trial? No, he did not. So the only thing we have as to him are the two affidavits? I believe so. All right, so the follow-up question I had asked you was articulate for us the deliberate indifference that you are opining from this. When he found out the record shows he fired him, right? So articulate for me, for us, what is the deliberate indifference that you're urging and peg it to which of our deliberate indifference cases you say best supports the proposition? I think that your question subsumed a fact there, which was that he learned of the reputation at the trial. Our factual support and allegation is that reputation existed before the trial. No, no, no. He terminated him subsequently. I'm not asking you a question based on any of them. I'm only asking you as you go to your seat to articulate for us what the legal argument is you're making of Chief Shaw's deliberate indifference in this case. That's what I'm asking. I'm asking you to state, which at least for me hasn't come clear through the briefing, articulate the deliberate indifference that we would find if we found it in this case based on what's in it. What is the deliberate indifference and what case dealing with deliberate indifference supports it? First, I think we can rely on the cases that we have cited. In fact, the cases cited by the city, Hardiman, for one, is quite different because it involves the failure to investigate, which would have led to some knowledge. Here, the inference is knowledge existed and that the chief had it, did not act on it. So the legal standards there that he was indifferent to that knowledge and took no action, that is the failure to act that would not be reasonable in the face of that knowledge. In the case of Bonner, Bonner was slightly different. It didn't involve knowledge. It involved the – and maybe I have them – my name is reversed. That's okay. Hardiman involved the lack of knowledge because of the lack of investigation. Bonner involved affirmative evidence of adequate training, which was in the record. And we don't have any of that in this record. All right. I have taken over. All right. Thank you, Mr. Richard. Thank you, sir. All right. We'll back up to you, Mr. Booker, for any rebuttal that you have. Your Honor, based on the argument of counsel, I really have nothing else in rebuttal to say other than that I do respectfully disagree that the trial transcript of the criminal trial for Detective Green was part of the summary judgment package. So was that – I just don't recall that. It may be, but I don't recall that. So is it the entire – is it the transcript of the entire trial or just the transcript of Gibson's testimony? That was part of the summary judgment? Yes. I believe just the part – the highlighted parts of Corporal Gibson's testimony concerning the various issues. I might add to the court that Corporal Gibson had some – when he refused to show up for a deposition, the second time or continuation of this, that there were actions taken to force him to show up and to testify. And the transcript might have been part of that record that would have been in the official record. But, again, I'm not certain that it was part of the motion for – Rule 56 motion for summary judgment record. So you're saying it might have been attached to the deposition transcript? Is that what you're saying? I don't think it was attached to the deposition transcript. But, again, it could have been, Your Honor. I did not look at that and don't have a recollection. But I don't think so. We'll double check it. Sir? We'll double check it. Any other questions? Thank you, Counsel. Thank you, Your Honor. All right. The case will be submitted. Thank you, Mr. Ritchie. Mr. Booker. Are you good? Are you going to take a shot?  All right.